UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HUSSEIN HAZIME, ET AL.,

      Plaintiffs,

v.

FOX TV STATIONS, INC.,

      Defendant.

_____/

Case No. 12-15072

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS [13]**

At a hearing held on August 14, 2013, this matter came before the Court on Defendant's[1] Rule 12(b)(6) motion to dismiss. Three individuals and three companies -- Hussein Hazime, Rima Abou-Alayoui, Hassan Hazime, Hassan's Shop, Inc., Timeless Mattresses LLC, and M&R Appliance and Mattresses LLC -- filed this Complaint on November 15, 2012. Plaintiffs' complaint alleges eight claims for relief. The first, second, fourth, and fifth claims for relief are expressly labeled "defamation" claims. (*See* Pls.' Compl.) The sixth claim is styled as a "tort/negligence" claim but alleges defamation. (*Id.*, ¶ 115. The seventh claim is styled as "injurious falsehood" but merely re-alleges the

_____

[1]Defendant informs the Court that New World Communications of Detroit, Inc. ("NWC") owns and operates the Detroit area television station WJBK (also known as "Fox 2") and the station's website, myfoxdetroit.com, which prepared and broadcast the two Reports at issue in this litigation. Defendant further advises the Court that NWC was erroneously named by Plaintiffs as "FOX TV Stations, Inc., d/b/a Fox 2 News and WJBK." Plaintiffs apparently were referring to Fox Television Stations, Inc., which is a sister corporation of NWC. Nonetheless, defense counsel brings this motion on behalf of the erroneously named Defendant Fox Television Stations, Inc. because Plaintiffs' claims, whether brought against FTS or NWC are subject to dismissal under Federal Rule of Civil Procedure 12(b)(6).

preceding claims for defamation and seeks attorney fees and costs.  (*Id.*, ¶ 119.)  The eighth claim is styled "Injurious Falsehood/Tortious Interference with an advantageous economic relationship and tortious interference with an economic relationship-Business defamation/defamation per se" and makes allegations suggesting that this claim also includes a claim of defamation.  (*Id.*, ¶¶ 121-129.)  Defendant's motion is GRANTED.  All claims brought by three Plaintiffs, Hussein Hazime, M&R Appliance and Mattresses LLC, and Rima Abou-Alayoui, are dismissed because Plaintiffs do not and cannot allege that any statements were made by Defendant "of and concerning" these three Plaintiffs that would give rise to the claims asserted.  All claims brought by the remaining Plaintiffs against Defendant are also dismissed.  Plaintiffs fail to defend and thus waive all but their defamation by implication and interference with contractual relations claims.  As to those two remaining claims, Plaintiffs have not and cannot establish that Defendant WJBK's broadcasts contain a materially false implication; and because that defamation claim fails, Plaintiffs' related tortious interference claim also fails.

## I.    Facts

Plaintiffs' Complaint alleges that WJBK broadcast two reports that give rise to their claims.  The First Report, which Plaintiffs describe as discussing their "refurnished mattress business," aired on July 25, 2012 as part of Fox 2's evening news program and also ran on Fox 2's website.  (Pls.' Compl., ¶¶ 18-19.)  The Second Report is described as a Fox 2 News "follow-up" story that related to Plaintiffs' businesses.  (*Id.*, ¶¶ 30-33.)  Because the allegations in Plaintiffs' Complaint are based upon and reference the First and Second Report and because these two reports are central to Plaintiffs' claims, this Court may consider them on Defendant's Rule 12(b)(6) motion to dismiss without converting that

2

motion into one for summary judgment. *See Greenberg v. Life Ins. Co. of* Va., 177 F.3d 507, 514 (6th Cir. 1999); Lacko *v. Mercy Hospital*, 829 F. Supp. 2d 543, 547 (E.D. Mich. 2011) (applying *Greenberg*); *DMC Plumbing & Remodeling, LLC v. Fox News Network, LLC*, No. 12-cv-12867, 2012 WL 5906870, at *3 (E.D. Mich. Nov. 26, 2012) (ruling in a defamation case that, because "the Complaint refers to the April 1, 2011 news broadcast, and the broadcast is central to Plaintiffs' claims for defamation," the DVD of that broadcast would be considered by the Court in ruling on the defendant's motion to dismiss).

The following facts are derived from the Court's review of the DVD containing the First and Second Reports that are central to Plaintiffs' claims alleging defamation.  (Def.'s Mot., Ex. A, DVD.)

The First Report, a "Problem Solver" segment styled as "Dirty Little Mattress Secret Uncovered," was aired on July 25, 2012 and begins with an introduction by WJBK anchors who comment about "mattresses that are made to look brand new but what's inside might keep you up at night" and how investigative reporter Rob Wolchek "pulls the covers off" and shows what goes on inside a local mattress factory and what he finds out "is no bed of roses."  Then, Wolchek introduces the story by discussing the various things in life that occur on beds, that people may not know what happens when you get rid of an old bed, but claims that he does know.

As Wolchek narrates, the screen reflects what he is describing, stacks of used and dirty old mattresses, stained and ripped, piled to the ceiling, and he comments "who'd sleep on one of those?  Well, guess what, you might be sleeping on one tonight."  Wolchek next briefly interviews a consumer, later identified as "Del," who talks about how the bed she

purchased looked "new" but that was "the trick of it" because "they" changed the top and stuffed "it" back.

The First Report then moves to a scene of an undercover reporter purchasing a mattress from Plaintiff Hassan's Shop, Inc. ("Hassan's Shop") while Wolchek narrates, stating that "We buy a mattress and uncover a dirty little secret of the mattress biz."  The undercover reporter purchasing the mattress asks, "This is new, right?"  The salesman responds, "Yeah, refurbished."  Next, the camera shows Wolchek cutting open the new cover on the outside of the mattress, while another man (later identified as a Wayne County Environmental Health Department inspector) shines a flashlight on the inside revealing old, stained bedding with a cigarette burn hole.

Wolchek narrates that mattresses are sold right here in Detroit and built in a factory in Livonia as the camera shows the outside of Plaintiff Timeless Mattresses LLC ("Timeless Mattresses") that supplies the mattresses to Plaintiff Hassan's Shop.  Wolchek, now on camera, asks a sales representative, later identified as Marcus, why they are using "old fabric" inside the mattresses and Marcus denies that they are doing so saying, "We're not using old fabric, sir."  Wolchek responds, "Dude, look."  The camera then shows the inside of the mattress purchased from Plaintiff Hassan's Shop, and then dirty and torn mattresses stacked high to the ceiling at the factory, and finally Marcus showing Wolchek around the factory.  Wolchek comments, "After seeing this story today, you might be waking up on the wrong side of the bed tomorrow."

The next scene is Wolchek interviewing a woman named Jonita who was formerly employed by Hassan's Shop and states that "they" are not good beds.  Wolchek comments that this store advertises that its beds are custom made, and the interview with Jonita is

4

punctuated with TV advertisements of Plaintiff Hassan's Shop which repeatedly promote its beds as "custom made."   Wolchek comments that "custom made is usually good but Jonita says, 'not in this case.'"   Jonita is then shown commenting that the beds are recovered and not completely stripped down; that the mattresses were not really stripped down all the way, but were half-stripped with new covering put over "the dirty."

As the next scene begins, Wolchek comments that, "the custom made beds at Hassan's Shop fooled Rober."  As Wolchek asks "did he tell you they were new beds, the camera shows customer Rober responding, "yes, brand new bed."   Upon further questioning by Wolchek, Rober acknowledges that it occurred to him later that it might be refurbished because it caved in too fast.  Wolchek reports that Rober, dissatisfied with the bed's quality, returned his mattress to Plaintiff Hassan's Shop and received another custom made mattress.

Wolchek then reports that Del also took her mattress back because she says it was full of bed bugs.  The camera then shows Del saying, "They were coming out from under the box spring lining of the bed."  Wolchek narrates that "Del was given another bed and guess what?"  The camera once again shows Del who says, "Bed bugs was in this one too."  Wolchek states that "Now Del sleeps with the plastic still on her custom made bed," as the camera shows Del's mattresses with the plastic wrap still on.  Wolchek narrates "she says she was tricked."  And, the camera shows Wolchek interviewing Del who says "They was supposed to be, from my knowledge, new beds, but come to find out they wasn't."

The First Report returns to the portion of the story where the undercover reporter purchases a "custom made" mattress from Hassan's Shop.  Viewers are shown Wolchek back at the station unwrapping the plastic covering and cutting into the custom made

mattress to see what is inside.  The camera focuses on the mattress tags.  There is a white tag on top that largely covers the yellow tag underneath it.  The only language visible on the yellow tag from underneath the white tag is the name "Timeless Mattresses" and its Livonia address.  Wolchek comments that both tags are under the plastic, the white tag is prominently displayed but doesn't reveal that second hand materials are used.  The yellow tag does reveal this information but is visible only if you lift up the white tag after removing the plastic.

The camera next shows Wolchek tearing open the mattress.  He identifies a Wayne County Environmental Health Department inspector who is observing Wolchek as he cuts into the mattress from Hassan's Shop, and both examine the mattress which reveals the presence of old, stained bedding materials.  Wolchek and the inspector comment on the presence of a lot of new foam padding but also note that the guts of the mattress contained used bedding.   The camera shows old and used bedding materials from inside the mattress.  Wolchek then comments about the good news/bad news from his inspection: "The good news is there are no bed bugs" but the inspector from the Health Department says that mixing new bedding and old bedding isn't something he'd recommend.  The inspector is then shown on camera saying that bed bugs are hitchhikers and travelers; that's how they get around; and they can be transported from one facility or site to another, even inside a refurbished mattress like the one shown on the camera.

Wolchek narrates again as the camera shows him going to Hassan's Shop to speak with Hassan, the owner, and stating his intent to show him what his investigation revealed.  On camera, Hassan denies that he has ever had a complaint from any customer.  The camera cuts away and Wolchek is heard saying, "What about Del and Rober?"

6

Next, as Wolchek narrates and the camera shows, Marcus gives a tour of Plaintiff Timeless Mattresses' factory -- the factory where Hassan's Shop gets the mattresses it sells. The camera shows piles of dirty mattresses in close proximity to mattresses being rebuilt. Marcus tells Wolchek that before they bring the old mattresses in, they inspect them and spray them, then bring them in and strip them down, that basically, only the spring system in the old mattress remains. Marcus asks Wolchek, "You think bedbugs are gonna live in a spring system?" The camera then shows the stacks of old and unstripped mattresses in the same vicinity as the new material and Wolchek narrates that Hassan's Shop buys its mattresses from this shop. Next, it shows Marcus conceding to Wolchek that the factory does sometimes use "old product, old stuff." As Wolchek states in his narrative and replays for the viewer, this statement contradicts Marcus's earlier statement that they don't use old fabric.

The final segment of the First Report has Wolchek commenting off camera, "So, whether you're shopping at Hassan's or at an upscale store in Livonia, you might get a mattress like this," and the camera shows the torn-apart mattress with the old and new materials inside that was purchased from Hassan's Shop by the undercover reporter. Wolchek then comments, "And, if you're looking for that yellow tag that says "Second Hand Materials," you might have to look a little harder." The camera then shows Wolchek inside a Timeless Mattresses store in Livonia asking to see the labels on the mattresses. A bed is pulled away from a wall, showing that the mattresses have two tags, a white on top of a yellow, and both are covered by plastic. Wolchek comments off camera, "Not exactly really visible." As shown earlier in the First Report, the top, white tag is visible to the customer under the plastic and states that the bed is manufactured by Timeless Mattresses

7

in Livonia and that it conforms to federal standards of flammability.  The second, yellow tag is placed directly under the white tag and the yellow tag's language, "Second Hand Materials," is completely covered by the white tag.

Back in the studio, Wolchek concludes by saying that he spoke with the manager of the Timeless Mattresses factory who said that they get their mattresses from companies that collect old mattresses but he didn't really say where those companies get the old mattresses; and tells viewers that all of this is perfectly legal but "kind of a gross thing;" and in response to an anchor's comment that he had just purchased a mattress from a major department store, Wolchek cautions that, although a mattress might look brand new, consumers should check the tags on the mattress to see if it contains second hand materials because "you never know."

The Second Report was aired on August 13, 2012 with two different Fox 2 News anchors introducing a follow-up on Wolchek's original story.  One anchor describes the segment as one about a Detroit-area mother who thought she was buying brand new beds for her family but she says the new-looking mattresses had bed bugs in them; the other anchor then comments, "It turns out they weren't new mattresses, they were old beds covered with new material. But there is a happy ending to this story."  Then "problem solver" Rob Wolchek is introduced.

Wolchek begins by identifying the Detroit mother as "Del" and the victim in his earlier story about refurbished beds and commenting that viewers would be surprised how many stores sell them, "but not one mattress man -- his name is Jeff -- and after seeing Del's story he wanted to make sure that Del's family went to bed at night knowing that their beds were brand new inside and out."  The camera then shows Del with her children rollicking

on a new mattress with Wolchek commenting that these children are happy because they're getting new beds courtesy of Jeff Scheuer of Mattresses To Go and Del expressing her gratitude.

While the camera shows Del and the white and yellow tags from the First Report, Wolchek narrates that Del was featured in a story he did a few weeks earlier that exposed "a dirty little secret" about the mattress business -- they're called refurbished mattresses. Wolchek explains that Del purchased three mattresses from Hassan's Shop in Detroit that advertises that its mattresses are custom made.  The Second Report then shows the segments from the First Report with Del and Hassan's Shop's TV advertisements.  Wolchek then comments "What does custom made mean?  In this case, it means made out of old mattresses."  The camera then shows footage from the Timeless Mattresses factory in Livonia as Wolchek narrates that "Here at this factory in Livonia, old dirty mattresses go in and new-looking ones come out."   He comments that people like Del and Rober featured in the First Report thought they were new and replays footage from the First Report of Rober and Del, along with Del's claim on camera that both her first and replaced mattresses from Hassan's Shop had bed bugs.  Wolchek also replays the segment where he sent an undercover reporter into Hassan's Shop to buy a mattress, took the mattress back to the station, opened it up and discovered old stained materials with a cigarette burn inside the new looking cover.  He discloses that he didn't find any bed bugs in the mattress, and replays the Health inspector's on-camera comments that he doesn't recommend mixing old bedding materials with new because bed bugs are hitchhikers that can be transported from one site to another even inside refurbished beds like the one shown on camera.

The Second Report then replays the segment from the First Report where Wolchek goes back to Hassan's Shop and speaks with Hassan who claims he has not had any complaints from any customers, and then replays Del's and Rober's complaints.  It also replays the segment showing the inside of the Timeless Mattresses factory with the old torn mattresses in close proximity to the new materials and replays Marcus's conflicting statements that Timeless Mattresses does not and does use old fabric in their refurbished mattresses.

Wolchek then explains that this is all perfectly legal, that these beds are sold in other shops in metro Detroit, but they are not sold in Jeff Scheuer's shop.  The camera then shows Jeff, explaining that he is a small business that just wanted to help Del's family get some nice new beds and "he's got them."  The camera shows Jeff and the mattresses he is delivering to Del's family.  Jeff explains that these mattress are "100% brand new."  Wolchek shows the old mattresses being removed from Del's home and comments, "Guess what was in those old mattress?  You got it.  Old bedding material."  The camera shows Jeff inspecting the inside of the Del's refurbished mattress that shows a Sealy tag and Jeff saying that he's sold Sealy mattresses for 20 years and did not recognize the material in Del's refurbished mattress and agrees with Wolchek that  the material could be 30 years old.

The Second Report concludes with Wolchek commenting that Jeff wanted to help Rober as well by giving him a new mattress, but by the time Wolchek reached Rober another company, Gardner White, had come forward to donate a brand new queen size mattress to Rober.  Wolchek explains that Rober and Del were not looking for any hand-out, rather they were just two people brave enough to go on camera and tell their stories

10

and help him out in exposing this refurbished mattress business and they got rewarded.

One of the two Fox 2 News anchors then comments that they've heard from so many

people telling them that bed bug infestations are a nightmare.  Wolchek responds that

these refurbished beds that they sell, you may think they are brand new beds, that it's very

deceiving, and what consumers need to do is look for the yellow tag (he holds one up for

the camera) but reminds viewers that even though they hide the yellow tags under white

tags, the law requires that the yellow tag that says second hand materials be on the

mattress and this means you might have an old bed inside your brand new bed.  In

response to an anchor's comment, Wolchek reiterates that this is all completely legal, that

it is buyer beware.  Wolchek also states that all the big companies like Sealy, Simmons,

and Serta are all safe but you can't always tell if a mattress is refurbished just by looking

at the price -- that it is a tricky business.

This matter is now before the Court on Defendant's motion to dismiss brought

pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II.    Rule 12(b)(6) Standard of Review

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the

sufficiency of a complaint.  In a light most favorable to the plaintiff, the court must assume

that the plaintiff's factual allegations are true and determine whether the complaint states

a valid claim for relief.  *See Albright v. Oliver*, 510 U.S. 266 (1994); *Bower v. Fed. Express

Corp.*, 96 F.3d 200, 203 (6th Cir. 1996).  To survive a Rule 12(b)(6) motion to dismiss, the

complaint's "factual allegations must be enough to raise a right to relief above the

speculative level on the assumption that all of the allegations in the complaint are true."

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and emphasis

11

omitted).  *See also Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 548 (6th Cir. 2007).  "[T]hat a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of all the elements of a cause of action, supported by mere conclusory statements do not suffice."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)  The court is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Id*. at 679 (internal quotation marks and citation omitted).  Moreover, "[o]nly a complaint that states a plausible claim for relief survives a motion to dismiss."  *Id.*  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief."  *Id.* (internal quotation marks and citation omitted).  Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.  While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Id.*  In sum, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face."  *Id.* at 678 (internal quotation marks and citation omitted).

## III.   Analysis

Defendant raises three principal arguments in support of its motion seeking dismissal of all claims asserted in Plaintiffs' complaint:  (1) claims brought by three of the Plaintiffs

12

should be dismissed because Plaintiffs do not and cannot allege that any statements were made by Defendant "of and concerning" these three Plaintiffs that would give rise to the claims Plaintiffs assert; (2) all but Plaintiffs' defamation by implication and tortious interference claims should be dismissed because Plaintiffs fail to defend them; and (3) as to the remaining two claims, Plaintiffs have not and cannot establish that Defendant WBJK's broadcasts contain a materially false implication; and because that defamation claim fails, Plaintiffs' related tortious interference claim also fails. The Court addresses each of these arguments in turn.

### A. All Claims Brought By Three of the Plaintiffs Are Dismissed

Defendant first argues that three Plaintiffs -- Hussein Hazine, M&R Appliance and Mattresses LLC, and Rima Abou-Alayoui – do not and cannot allege that Defendant published a false and defamatory statement or implied a false and defamatory statement about them, requiring dismissal of all claims asserted by them against Defendant. This Court agrees.

Under Michigan law, to prevail on a defamation claim, a plaintiff must allege and establish that the defendant published a false and defamatory statement concerning that plaintiff. *See Curtis v. Evening News Assoc.*, 352 N.W.2d 355, 356 (Mich. Ct. App. 1984) (holding that "[b]ecause plaintiff failed to allege that defendant published a false and defamatory statement 'concerning plaintiff,' plaintiff failed to state a claim on which relief could be granted"). *See also Pullman Indus., Inc. v. Mfrs. Enameling Corp.*, 15 F. App'x 297, 303 (6th Cir. 2001) (affirming the district court's grant of summary judgment in favor of the defendant on the plaintiff's defamation claim and concluding "that the lack of any direct or indirect defamatory reference to [the defendant] in [the challenged publication]

13

defeats the plaintiff's defamation claim as a matter of law."); *Siddiqui v. Gen. Motors Corp.*, No. 302446, 2012 WL 335680, *6 (Mich. Ct. App. Feb. 2, 2012) (observing that "[o]ne of the basic requirements of a defamatory statement is that it must have a specific reference to the plaintiff" and holding that "the trial court did not err in dismissing plaintiff's business defamation claim" when "the allegedly defamatory statements contained in the letter do not have a specific application" to the corporate plaintiff).

The three Plaintiffs that Defendant identifies -- Hussein Hazime, M&R Appliance and Mattresses LLC, and Rima Abou-Alayout – have not and cannot allege facts that satisfy this essential element of a defamation claim.  Plaintiffs' complaint makes no allegations regarding these three Plaintiffs other than to state that they are either a Michigan resident or Michigan corporation.  (Compl., ¶¶ 6, 8, 9 and 11.)  That Plaintiff Hussein Hazime is the sole member of Plaintiff Timeless Mattresses LLC fails to satisfy this element.  Statements about corporate Plaintiff Timeless Mattresses LLC are not, as a matter of law, statements "of or concerning" individual Plaintiff Hussein Hazime.  *See Gilbert Shoe Co. v. Rumpf Pub. Co.*, 112 F. Supp. 228, 229 (D. Mass. 1953) (affirming decision dismissing the individual plaintiff's defamation claims for failure to state a claim upon which relief could be granted because "[t]he allegedly libelous statement involved here refers solely to the plaintiff corporation and not to the individual plaintiff" and "[i]t is essential in an action for libel that the publication of the libel should be of or concerning the plaintiff.  One who is not himself libeled cannot recover even though he has been injured by the libel published concerning another.  In particular, an officer or stockholder of a corporation who is not personally libeled has no right to recover for a libel published of the corporation.") (internal citations omitted).  *Accord*, *AIDS Counseling and Testing Ctrs. v. Group W Television, Inc.*, 903 F.2d

14

1000, 1005 (4th Cir. 1990) (affirming the dismissal of individual plaintiff and observing that "[c]ommon sense, as well as the law of defamation, dictates that, in order for a claim for defamation to arise, a publication must refer to the individual who seeks to sue on the publication.") (citing cases).

The Court now addresses Defendant's second argument -- that Plaintiffs' failure to defend all but two of their claims in response to Defendant's motion to dismiss results in a waiver of those claims.

### 2.  Claims Not Addressed Are Waived

Defendant argues that Plaintiffs' failure, in their response brief, to address the merits of all but their defamation by implication and tortious interference claims results in a waiver of those ignored claims.  This Court agrees.

"The Sixth Circuit has held that a party's failure to respond to or oppose an issue raised in a Rule 12(b)(6) motion may result in waiver of the issue." *Simpson v. G4S Secure Solution (USA), Inc.*, ___ F. Supp. 2d ____, 2013 WL 2014493, *3 (W.D. Tenn. May 13, 2013) (citing *Allstate Ins. Co. v. Global Med. Billing, Inc.*, No. 12-1263, 2013 WL 1405142, *3 (6th Cir. Apr. 8, 2013); *Humphrey v. U.S. Attorney Gen.'s Office*, 279 F. App'x 328, 331 (6th Cir. 2008)).   The same result applies to claims that a plaintiff fails to defend in response to a defendant's motion to dismiss.  *See Rondigo, LLC v. Twp. of Richmond, Mich.*, No. 12-1515, 2013 WL 1271668, *2 (6th Cir. Mar. 28, 2013) (affirming the district court's dismissal of the plaintiff's state-law claims and holding that "the plaintiffs have waived these claims" because "[t]he plaintiffs did not address the merits of their state-law claims and therefore failed to develop their argument against dismissal.").

15

Because Plaintiffs fail to defend the following six claims in response to Defendant's Rule 12(b)(6) motion to dismiss, they are dismissed:  Libel per se (Claims 1 and 2), false light (Claim 3), reckless disregard/actual malice (Claim 5), negligence (Claim 6), and the claim for legal fees and costs (Claim 7).

The Court now turns its attention to the defamation by implication and tortious inference claims that Plaintiffs do defend.

### C.  Plaintiffs Cannot State A Claim For Defamation By Implication

Defendant next argues that Plaintiffs cannot state a claim of defamation by implication, and Plaintiffs argue the opposite. The Court begins its analysis of the parties' arguments with a discussion of the legal principles that govern defamation claims involving private-figure Plaintiffs, matters of public concern, and a news media Defendant.

As the Michigan Supreme Court observed in *Rouch v. Enquirer & News of Battle Creek Michigan*, 487 N.W.2d 205, 258 (Mich. 1992), "[t]he common law has never required defendants to prove that a publication is literally and absolutely accurate in every minute detail."  Moreover, "[i]n contrast to the early common law, where falsity was presumed and the defendant was required to prove substantial truth as a defense, the burden of proving falsity has now been shifted to the plaintiff." *Id.* at 259.  As to Michigan's common-law test for falsity, the *Rouch* court clarified that "[m]inor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified.  Put another way, the statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Id.* at 260 (quoting *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991) (internal quotation marks and citations omitted)).

16

Michigan law recognizes "a cause of action for defamation by implication," that can only be established "if the plaintiff proves that the defamatory *implications* are materially false" but does not require "a direct showing of any actual literally false *statements*." *Hawkins v. Mercy Health Servs., Inc.*, 583 N.W.2d 725, 732 (Mich. Ct. App. 1998) (emphasis in original) (discussing *Locricchio v. Evening News Ass'n*, 476 N.W.2d 112 (1991)). The leading case on defamation by implication claims is *Locricchio v. Evening News Association*, 476 N.W.2d 112 (1991). There, the Michigan Supreme Court examined the plaintiffs' defamation claim based on the Detroit News' publication of a four-part series of articles on the plaintiff's development of the Pine Knob complex in the 1970's. *Locricchio*, 476 N.W.2d at 114. Plaintiffs were unable to identify any materially false statements of fact in the reporting and relied instead on a claim of defamation by implication. *Id.* Specifically, they claimed that "the Pine Knob series as a whole falsely implied that plaintiffs were members, or associates of organized crime" and that "the layout of the Pine Knob articles, including photographs and headlines, as well as the repetition of certain words such as 'Mafia,' 'Sicilian," and 'money wash,' and indeed certain specific statements, contribute to the overall implication." *Id.* at 132. The plaintiffs had prevailed on their claim at trial, but "the trial court ruled that the evidence regarding falsity did not support the jury's verdict, and directed a verdict for the Detroit News." *Id.* at 114. Plaintiffs then prevailed on appeal, and this time the Detroit News filed an appeal. *Id.* The Michigan Supreme Court considered two issues on appeal: (1) did the Court of Appeals err in reversing the trial court's directed verdict; and (2) "can a private-figure plaintiff recover damages in a media-defendant/public-interest subject matter libel action where the plaintiff alleges defamatory implication but fails to identify or prove any materially false factual

17

statements or implications or omissions?"  *Id.*  As to the first issue, it held that the Court of Appeals did err "in reinstating the jury verdict in favor of plaintiffs."  *Id.* at 115.  The Michigan Supreme Court then found that, because the plaintiffs failed to prove "falsity in either the underlying facts or in their implication," it need not "answer the second question as posed."  *Id.*  Rather, it held "simply that the plaintiffs failed to carry their burden of proving either false and defamatory factual statements or false implications."  *Id.*  As the *Locricchio* court explained:

> Unfortunately for the plaintiffs, an inescapable implication of the Pine Knob series conforms to the facts developed at trial:  the plaintiffs had numerous financial and social connections with reputed organized crime figures and these associations contributed in the financing of Pine Knob and prompted intense investigative scrutiny, if not harassment, from law enforcement authorities. <u>Although capable of defamatory interpretation, the implications alleged by the plaintiffs do not arise from false facts or material omissions, and, standing alone, are not even proven by the plaintiffs to be false.</u>

*Id.* at 132 (emphasis added and internal footnote omitted).

Plaintiffs do not contest the well-established legal principles that they have the burden of proving falsity, that this burden cannot be met if the gist or sting of the alleged libel does not leave a different impression than would the literally accurate facts, and that a court must view the challenged statements in the context of the entire broadcast.  (Resp. at 3-4, 6, 12.)  Plaintiffs here do not identify any materially false facts in the Reports.  Rather, similar to the *Locricchio* plaintiffs, they argue that the Reports, as a whole, give rise to false implications -- that they were intentionally and dishonestly passing off refurbished mattresses as new (Resp. at 10), that Plaintiffs' customers were unhappy and not satisfied with their mattresses (Resp. at 11); that the mattresses Plaintiffs sold were contaminated with bed bugs (Resp. at 13), and that Plaintiffs "are running dishonest, unethical, illegal

18

businesses." (Resp. at 13.) Plaintiffs also argue that Defendant's omission of a material fact from the Reports -- that customers sign a receipt that discloses that "All mattresses are rebuilt/Reconditioned" -- also helped create the false impression that Plaintiffs were passing off refurbished mattresses as new to unsuspecting consumers. (Resp. at 6.) This Court disagrees with Plaintiffs.

Addressing the third argument first, it cannot be disputed that Wolchek, in both Reports, repeatedly stated that the refurbished mattress business featured in his "Problem Solver" segment was perfectly legal. These statements are not capable of the defamatory meaning that Plaintiffs contend is the gist and sting of the First and Second Reports.

Plaintiffs' second argument -- that the Reports created the false impression that they sold mattresses that were contaminated with bed bugs fails -- also fails. First, it was Del, a customer of Plaintiff Hassan's Shop, who stated on camera her belief that both the original and replacement mattresses she got from Hassan's Shop were contaminated with bed bugs, not Defendant. Plaintiffs' claim is similar to one raised by the plaintiff in *McLachlan v. Kneff*, No. 193448, 1997 WL 33344009, *3 (Mich. Ct. App. 1997) and rejected by the Michigan Court of Appeals. The plaintiff's defamation claim in *McLachlan* was rejected because the article the defendant had published in a local paper reported what someone else had told the defendant reporter -- that the plaintiff had offered that other person a bribe -- and the plaintiff could not dispute that that other person had in fact made the allegedly defamatory statement. The *McLachlan* court ruled that the plaintiff's attempts to dispute "that he did not actually offer a bribe," failed to establish that what the defendant published was false, and thus affirmed the dismissal of plaintiff's "claim of defamation regarding defendant Dresch's article." *Id.* at *2. The same reasoning and result apply here.

19

The Reports at issue here truthfully reported that it was Del who said the mattresses she purchased from Hassan's Shop had bed bugs. Plaintiffs do not allege or argue that Defendant inaccurately portrayed Del's belief that there were bed bugs in the mattresses she bought from Hassan's Shop. Accordingly, Plaintiffs' cannot establish a defamation claim arising out of Del's statements about bed bugs or Defendant's accurate portrayal of her comments. The same is true of the Environmental Health Department inspectors' on-camera recommendation that old bedding materials not be mixed with new because bed bugs are hitchhikers and travelers that can be transported from one facility or site to another even inside refurbished beds like the one purchased by the undercover reporter at Hassan's Shop; a mattress that Defendant's investigative reporter Wolchek expressly stated on camera did <u>not</u> have bed bugs. The Reports also showed Marcus, an employee of Plaintiff Timeless Mattresses LLC, asserting on camera that they strip mattresses down to the spring system and bed bugs could not live in a spring system. That "bed bugs" were mentioned several times both in the Reports and in the anchor's pre- and post-airing comments is insufficient to establish a claim of defamation by implication. As the *Locricchio* court made clear, Plaintiffs must show that the Reports "as a whole disseminate false impressions," and they cannot meet that burden here. *See Locricchio*, 476 N.W.2d at 133.

Next, the Court addresses Plaintiffs' argument that the Reports created that false impressions that they sold mattresses that looked new on the outside but contained used bedding materials on the inside and that they tried to equate "refurished" or "custom made" with "new." These arguments are rejected because Plaintiffs cannot show that these impressions are materially false.

20

Similar to Del's bed bug assertion, investigative reporter Wolchek accurately reported the impressions of two customer's of Hassan's Shop -- Del and Rober -- who said they believed that the mattresses they bought were new.   Defendant did not make these allegations, Del and Rober did.  Accordingly, the holding in *McLachlan* applies here as well -- Plaintiffs cannot prove the requisite element of falsity in Defendant's Reports about Del and Rober's personal impressions that the mattresses they purchased were new.

Likewise, Plaintiffs do not dispute facts that give rise to the impression that the mattresses consumers were purchasing looked new on the outside but contained used bedding materials on the inside and that consumers may be unaware of that fact.  This is an impression that Plaintiffs' cannot prove to be false in light of the following undisputed facts:

.   Plaintiffs covered used bedding materials with new fabric, and then wrapped the completed, refurbished product in plastic;

.   Plaintiff Hassan's Shop markets its mattresses as "custom made;"

.   Plaintiff Hassan's Shop's salesman replied to an undercover reporter's question, "This is new, right?" with "Yeah, refurbished;"

.   The mattress purchased from Hassan's Shop was taken back to Defendant's station, cut open by investigative reporter Wolchek, and exposed that used, soiled bedding materials were inside that mattress;

.   The mattresses Del said she purchased from Hassan's Shop and thought were new were also cut open and old, used bedding materials were found inside;

21

.   Marcus from Plaintiff Timeless Mattresses LLC initially denied and subsequently admitted on camera that "old product, old stuff" was used in their mattresses -- mattresses that were sold to Hassan's Shop;

.   Plaintiffs attach the legally-required yellow tags with language informing consumers that "This article of bedding consists of in whole or in part Second Hand Materials" but do not deny that this yellow tag is placed under a white label that obscures that text and do not deny that both labels and the entire mattress are then covered with plastic wrapping; and

.   Plaintiffs display the mattresses to customers with the plastic-wrapped labels against the wall.

The Court rejects Plaintiffs' claim that Defendant's Reports omitted a material fact -- that customers sign a receipt after purchasing a mattress that discloses that "All Mattresses are rebuilt/Reconditioned" (Pls.' Compl., Ex. B, 2/28/12 Sales Receipt) -- because that receipt fails to disclose that old, stained bedding materials are used in mattresses that are "rebuilt/Reconditioned." That is the whole point of Defendant's Problem Solver Reports. Revelation of the signed receipt does not render the "gist" and "sting" of Defendant's Reports, when viewed as a whole, to be materially false.

The gist and sting of Defendant's Reports is "buyer beware;" and more specifically, although the refurbished mattress business practices exposed in the Reports are perfectly legal, and the mattresses sold may look like new because they are covered with new material and wrapped in plastic, buyers should always look underneath this plastic wrapping for a yellow tag with the words "Second Hand Materials" that is required by law to be placed on the mattress but is often hidden underneath a white tag because the

22

"Second Hand Materials" in that mattress may include used, dirty, stained bedding hidden underneath newer material just like the mattress the investigative reporter purchased from Hassan's Shop.

Finally, the Court addresses Plaintiffs' remaining complaints about the title of the Problem Solver segment, "Dirty Little Mattress Secret Uncovered," and isolated commentary, i.e., "It looks like a new bed [but] when you open it there was something inside that could give you nightmares;" "It's a Problem Solver story that gave people the creeps -- an expose of the refurbished mattress business;" and "Problem Solver Rob Wolchek takes you inside a mattress factory in suburban Detroit, and what you'll see will have you tossing and turning all night."  The Court agrees with Defendant -- these statements fall within the rhetorical hyperbole doctrine.

In *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19-20 (1990), the Supreme Court reaffirmed the legal principles that "a statement on matters of public concern must be provable as false before there can be liability under state defamation law, at least in situations . . . where a media defendant is involved;" that "a statement of opinion relating to matters of public concern which does contain a provably false factual connotation will receive full constitutional protection;" and that First Amendment protection is afforded to "statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual" because "[t]his provides assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation."  *Id.* at 20 (quoting *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988)).  The *Milkovich* Court observed that it has "recognized constitutional limits on the *type* of speech which may be the subject of state defamation actions" in those

23

circumstances where "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole. . . ."  *Id.* at 16-17 (internal quotation marks and citation omitted).  Michigan courts have recognized and applied this "rhetorical hyperbole" doctrine.  *See, e.g., Garvelink v. Detroit News*, 522 N.W.2d 883, 886  (Mich. Ct. App. 1994) (holding that, "as a matter of law,"  a satirical column about a local school superintendent could not "reasonably be interpreted as stating actual facts about plaintiff and it is, therefore, protected speech.").

Statements that "something inside" refurbished mattresses "could give you nightmares," or that the Problem Solver story about refurbished mattresses "gave people the creeps,"  or will have viewers "tossing and turning all night," likewise cannot reasonably be interpreted as stating actual facts about Plaintiffs and thus constitutes rhetorical hyperbole and protected speech.  Moreover, to point, as Plaintiffs do, to the segment's title, "Dirty Little Mattress Secret Uncovered, in isolation violates the well-established legal principle that this statement must be viewed in the context of the entire First and Second Reports.  Just like the plaintiffs in *Locricchio*, Plaintiffs here seem to want to have it both ways on their defamation by implication claims, i.e., "[o]n the one hand, they assert that the [reports] as a whole disseminate false implications" while "[o]n the other, they point to statements or headlines in isolation from the whole. . . ."  *Locricchio*, 476 N.W.2d at 133. Prevailing defamation law does not allow them to do this.  When read in context, the segment title as well as the other statements discussed above, are protected "rhetorical hyperbole."  *See Fielder v. Greater Media, Inc.*, No. 267495, 2006 WL 2060404, *3 (Mich. Ct. App. July 25, 2006) (observing that the title of an article about Cecil Fielder, "'Gambling Shatters Ex-Tiger's Dream Life,' and statements 'unstoppable gambling compulsion,' and

24

'Fielder is in hiding,' are also protected 'rhetorical hyperbole when read in the context of the article" because when "read in context," these statements "would not be understood by the ordinary reader as statements of actual fact about the plaintiff.").

The Court now addresses Plaintiffs' claims of tortious interference.

### D.  Plaintiffs Cannot State a Claim for Relief for Tortious Interference

Plaintiffs' Eighth Claim for Relief is styled, "Injurious Falsehood/Tortious Interference with an advantageous economic relationship and tortious interference with an economic relationship -- Business defamation/defamation per se" and primarily re-alleges their defamation claims.   (Pls.' Compl.,  ¶¶  121-129.)     Accordingly, because Plaintiffs' defamation claims are dismissed, their related tortious interference claim fails as well.  It is well-established in Michigan law that once a defamation claim fails, all related tortious interference claims fall with it.  *See Lakeshore Cmty. Hosp., Inc. v. Perry*, 538 N.W.2d 24, 27 (Mich. Ct. App. 1995) (observing that "[a]s with defamation actions, where the conduct allegedly causing the business interference is a defendant's utterance of negative statements concerning a plaintiff, privileged speech is a defense.").

## IV.  Conclusion

For the above-stated reasons, Defendant's motion to dismiss is GRANTED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  August 19, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 19, 2013, by electronic and/or ordinary mail.

s/Johnetta M. Curry-Williams
Case Manager
Acting in the Absence of Carol A. Hemeyer

25